Board of Tax and Land Appeals
No. 2003-547

APPEAL OF THE CITY OF PORTSMOUTH
(New Hampshire Board of Tax and Land Appeals)

Argued: March 10, 2004
Opinion Issued: June 25, 2004

*Flygare, Schwarz & Closson, PLLC,* of Exeter (*Thomas M. Closson* on the brief and orally), for the petitioner.

*Peter W. Heed,* attorney general (*Anne M. Edwards,* associate attorney general, on the brief and orally), for the respondent, New Hampshire Department of Revenue Administration.

DALIANIS, J. The City of Portsmouth (Portsmouth) appeals the New Hampshire Board of Tax and Land Appeals (Board) decision upholding the department of revenue administration's (DRA) determination that approximately $1.2 million in revenue received by Portsmouth from the Pease Development Authority (PDA) airport district is a "payment in lieu of taxes" (PILOT) and, therefore, is includable in the calculation of Portsmouth's 2002 total equalized valuation. We reverse.

The New Hampshire legislature established the PDA to convert and redevelop the former Pease Air Force Base, which is located in Portsmouth and the towns of Newington and Greenland, "for the benefit of the affected communities, the seacoast region, and the state." RSA 12-G:1, III (2003); *see* RSA ch. 12-G (Supp. 2003). The federal government transferred title of Pease Air Force Base to the PDA pursuant to the Federal Surplus Property Act of 1944. *See* RSA 12-G:2, I(a); *see also* 49 U.S.C. § 47107 (2003).

A portion of the property transferred to the PDA is identified as the airport district. *See* RSA 12-G:2, I. The airport district is located in both Portsmouth and Newington and is exempt from State and local property taxation. *See* RSA 12-G:14, I. Portsmouth began providing police, fire and public works services to the airport district in 1993; since that time, the PDA has paid Portsmouth for those services.

Initially, the PDA paid a flat rate per square foot of building area for the services. In 1998, the PDA and Portsmouth entered into a written Municipal Services Agreement (Agreement), which contained a new method of calculating payment for the services. The Agreement states that Portsmouth provides certain municipal services to the PDA airport district and, in return, the PDA "compensate[s] [Portsmouth] fairly, for providing the [services]." The Agreement provides for the PDA to pay a municipal services fee to Portsmouth in "an amount equal to the amount that would have been paid annually as *ad valorem* taxes but excluding any school tax component in respect to such property." Newington provides police services to the portion of the airport district that is located within its boundaries, although the PDA makes payments only to Portsmouth for the services. Portsmouth then reimburses Newington based upon the time

Newington police spend in the airport district. Portsmouth provides all other services to the entire airport district.

From the inception of the PDA until 2002, Portsmouth, the PDA and the DRA treated money paid by the PDA to Portsmouth for municipal services in the airport district as revenue *not* included in the calculation of Portsmouth's total equalized valuation. Thus, payments made pursuant to the Agreement were not considered PILOTs, because PILOTs are included in a municipality's total equalized valuation. The revenue Portsmouth collected from the PDA for the non-airport district property, however, was consistently reported to the DRA as a PILOT and considered in its total equalized valuation.

By notice dated May 22, 2003, the DRA revised and increased Portsmouth's 2002 total equalized valuation by $67,614,510. The DRA increased the total equalized valuation upon determination, for the first time, that approximately $1.2 million in revenue paid to Portsmouth by the PDA airport district should be considered a PILOT within the meaning of RSA 21-J:3, XIII (Supp. 2003). RSA 21-J:3 directs the DRA to include "payments in lieu of taxes as may be equitable and just" when equalizing the valuation of the property assessed. The statute does not provide a definition of PILOTs, however, and the DRA concedes that there "is no general definition for 'payment in lieu of taxes.'" This term and similar terms are used in other legislation to refer to payments to municipalities for tax-exempt property made instead of real property taxes. *See* RSA 72:11 (2003); RSA 72:23-n (2003); RSA 203:22 (2000); RSA 162-A:24 (2002); RSA 374-B:14 (1995). We have upheld agreements and statutes authorizing PILOTs. *See Lower Village Hydroelectric Assocs. v. City of Claremont*, 147 N.H. 73 (2001); *Opinion of the Justices (Mun. Tax Exemptions for Elec. Util. Personal Prop.*, 144 N.H. 374 (1999).

Portsmouth appealed the DRA's determination to the Board, arguing that the airport district revenue is not a PILOT and, therefore, should not be included in its total equalized valuation.

The Board reviewed whether the revenue from the PDA airport district is a PILOT or, in the alternative, a payment for services pursuant to a contract between Portsmouth and the PDA. The Board based its decision upon the premise that "PILOTs ... generally refer to sums paid by an otherwise tax exempt property owner ... to a municipality to compensate for the burdens of providing basic municipal services such as police and fire protection." Additionally, the Board found that RSA 12-G:14, III's references to the airport district revenue reveal that it is "more indicative of a PILOT than some alternative form of municipal revenue," such as a contractual payment. The Board affirmed the DRA's determination that the airport district revenue should be treated as a PILOT, except that the

amount Portsmouth paid to Newington for police services should be excluded.

On appeal, Portsmouth argues that the DRA erred by including the airport district revenue in the total equalized valuation because that revenue is not a PILOT, but rather a municipal services fee pursuant to a contract for services voluntarily entered into by the PDA and Portsmouth.

Portsmouth has the burden of showing that the Board's decision is clearly unreasonable or unlawful, and all findings of the Board upon questions of fact shall be deemed to be *prima facie* lawful and reasonable. *See Appeal of Land Acquisition,* 145 N.H. 492, 496 (2000).

We first address the Board's recognition of PILOTs as "sums paid by an otherwise tax exempt property owner . . . to a municipality to compensate for the burdens of providing basic municipal services such as police and fire protection." We find this general definition of PILOTs persuasive.

PILOTs, within the meaning of RSA 21-J:3, XIII, involve tax-exempt property for which a municipality must provide basic municipal services. The municipality necessarily incurs the costs of providing such services without receiving compensation through payment of real estate taxes. PILOTs offset the losses incurred by the municipality. *Cf.* RSA 72:23-j, :23-k (2003) (the owner of the tax exempt property "shall enter into an agreement with the municipality in which the property is situated to pay the municipality . . . a sum in lieu of taxes to defray the costs of municipal, non-utility, services"); RSA 162-A:24 (tenants of tax exempt property shall pay "in lieu of such taxes . . . to the municipality in which the property is located, for its just share of the public expense, including, but not limited to, education, highway maintenance, fire and police protection and other similar public expenses and governmental services").

PILOTs may be equivalent to a "sum representing ten percent of the shelter rent received by the owner," RSA 72:23-d to :23-k (2003); an amount consistent with the maintenance of the property, *see* RSA 203:22; an agreed upon amount between the property owner and the municipality, *see Lower Village Hydroelectric Assocs.,* 147 N.H. at 73; or the amount that would have been paid in *ad valorem* taxes had the property not been tax exempt, *see* RSA 423:9 (2002). Although RSA 72:23-d to :23-k require certain tax-exempt organizations to pay a PILOT unless the Board chooses to abate the PILOT for good cause shown, RSA 72:23-n authorizes municipalities to negotiate and accept voluntary PILOTs from any partially or fully exempt properties. The legislature provides for PILOTs in order to ease the financial burden on municipalities caused by tax-exempt properties.

The DRA argues that the PDA airport district revenue is a PILOT, within the meaning of RSA 21-J:3, because RSA 12-G:14, III refers to payment by the PDA airport district as a "municipal services fee in lieu of real estate taxes"; thus, it argues that under the plain meaning of the statute, the revenue is a PILOT.

Portsmouth argues that under the Board's definition of a PILOT, the PDA airport district revenue is not a PILOT because it does not defray costs of municipal services that Portsmouth is obligated to provide. *See* RSA 12-G:14, IV. Portsmouth contends that the Agreement is a contract that establishes a fee paid by the PDA to Portsmouth in exchange for police, fire and public works services in the airport district. Portsmouth argues that RSA 12-G:14, III merely "codifies a process for challenging [the] calculation" used in the Agreement to determine the contract price paid by the PDA airport district, but "provides little, if any, insight as to the character of the payment."

We are the final arbiter of the meaning of a statute as expressed by the words of the statute itself. *Sanborn Regional Sch. Dist. v. Budget Comm. of the Sanborn Regional Sch. Dist.*, 150 N.H. 241, 242 (2003). We interpret statutes not in isolation, but in the context of the overall statutory scheme. *Cross v. Brown*, 148 N.H. 485, 486 (2002). Although we give undefined language its plain and ordinary meaning, we must keep in mind the intent of the legislation, which is determined by examining the construction of the statute as a whole, and not simply by examining isolated words and phrases found therein. *Id.*

RSA 12-G:14 creates the State and local taxation obligations and accounts for the provision of services to the PDA's property, which includes the airport district, property within the boundaries of Pease Air Force Base but outside of the airport district, property formerly held by the New Hampshire State port authority, and property acquired by the PDA pursuant to RSA 12-G:39. *See* RSA 12-G:14.

The first paragraph of RSA 12-G:14 states that "except as provided in paragraph II, the [PDA] shall not be required to pay any tax or assessment on any property or project owned by the [PDA] under the provisions of this chapter or upon the revenues from such property or project." RSA 12-G:14, I. Paragraph II provides for monies paid by a party for the non-airport district, paragraph III refers to monies that may be paid by a party for the airport district, and paragraph IV outlines the responsibility and method of payment for municipal services. *See* RSA 12-G:14, I - IV. Paragraph IV is divided into subsections (a) and (b), which discuss the provision of municipal services to the airport district, and (c), which discusses the provision of municipal services to the non-airport

district. *See* RSA 12-G:14, IV. We examine each paragraph in RSA 12-G:14 in turn.

*I. PILOTs for the non-airport district*

Paragraph II sets out a tax scheme to be applied to "[a]ll airport property within the boundaries of Pease Air Force Base but *outside the airport district.*" RSA 12-G:14, II (emphasis added). This property, although tax exempt if owned or occupied by the PDA or any other entity exempted from taxation under RSA 72:23, is subject to "all applicable property taxes of the municipality" in which the property is located if it is leased or rented to a non-exempt entity. *Id.* Paragraph II outlines how such payments are to be paid, assessed, and challenged. *Id.* The legislation explains that such payments, unique to property *outside* the airport district occupied by non-exempt entities, shall be paid "in lieu of real estate taxes, to the municipality in which the property is located" in an amount equal to what would have been paid as *ad valorem* taxes for the property had it not been owned by the PDA. RSA 12-G:14, II(a). In prior years, Portsmouth had reported to the DRA payments collected pursuant to RSA 12-G:14, II as PILOTs, and such payments were consistently included in the calculation of Portsmouth's total equalized valuation for the applicable years. Paragraph II does not refer to any taxes or PILOTs to be paid with respect to property within the airport district. *See* RSA 12-G:14, II.

*II. Municipal services for the non-airport district*

RSA 12-G:14, IV sets forth the method by which services will be provided to the Pease Air Force Base property outside the airport district. "Outside the airport district the provision of the municipal services by the towns of Greenland and Newington and the city of Portsmouth shall be governed by the general law of the state and the other provisions of this chapter." RSA 12-G:14, IV(c). Thus, the municipality within which the non-airport district land is located is responsible for all municipal services as though it were any other property in the municipality, whether that property is exempt from real estate taxes or not. Similar to other legislation that exempts certain property from real estate taxes, the legislation mandates payments in lieu of taxes to the municipality with respect to the exempt properties. *See* RSA 12-G:14, II(a); *see also* RSA 72:11; RSA 72:23-d to :23-k; RSA 72:23-n; RSA 203:22; RSA 162-A:24; RSA 374-B:14. RSA 12-G:14, IV(c) requires Portsmouth to provide all municipal services to property outside the airport district, and RSA 12-G:14, II mandates that a PILOT be made to Portsmouth for that property. It follows that the legislature intended to compensate Portsmouth for the

costs of providing the services pursuant to RSA 12-G:14, IV(c). *Cf.* RSA 72:23-j, :23-k; RSA 162-A:24; RSA 162-I:15 (2002).

*III. Municipal services for the airport district*

In contrast to RSA 12-G:14, IV(c), RSA 12-G:14, IV(a) and (b) vest exclusive responsibility for almost all municipal services for the airport district in the PDA, and not in Portsmouth or Newington. "Security for all land and buildings within the airport district and security for all flights" shall be provided by the PDA. RSA 12-G:14, IV(a). However, "[a]ll other police services within the airport district shall be provided by the municipalities." *Id.* So, while RSA 12-G:14, IV(a) *relieves* the municipality of the responsibility of providing security to the PDA airport district, it *requires* the municipality to provide "all other police services." *See id.* Thus, any payments made to Portsmouth to defray the costs of police services other than security are PILOTs. Payments for security provided by Portsmouth to the PDA airport district, however, are not PILOTs, because Portsmouth is not obligated to provide security to the PDA airport district. We do not know, and the issue is not before us to decide, what constitutes "security" and "all other police services" under RSA 12-G:14, IV(a).

RSA 12-G:14, IV(b) states that "the provision of all other services to land, buildings, and people in the airport district which are traditionally provided by the town of Newington and/or the city of Portsmouth shall be exclusively the responsibility of the [PDA]." This section delineates, but does not limit, such services that are "traditionally provided by" the municipalities to include fire protection, roadway maintenance, and public utilities. RSA 12-G:14, IV(b). The statute allows the PDA to "contract with any person for the provision of these services." *Id.* Thus, the PDA may either contract for other "traditional" municipal services with any person or provide such services itself; the municipalities, however, are not responsible by statute for these services. *See* RSA 12-G:14, IV(a), (b).

The legislation does not require a PILOT payment to be made to Portsmouth for property within the airport district, with the limited exception of costs for police services other than security. *See* RSA 12-G:14. Such a requirement is unnecessary, because Portsmouth is not burdened with the general responsibility or costs of providing all municipal services to the airport district. *See* RSA 12-G:14, IV(a), (b). Since Portsmouth *is* obligated to provide all municipal services to the non-airport district property, the legislature mandates a PILOT payment that offsets the costs associated with providing such services. *See* RSA 12-G:14, II.

*IV. Municipal services fee for the airport district*

The DRA relies upon language in paragraph III, specifically the phrase "municipal services fee in lieu of real estate taxes," as evidence that all of the revenue paid by the PDA airport district is, in fact, a PILOT as intended by RSA 21-J:3, and, therefore, would be similar to the PILOT demanded by paragraph II and other statutes. *See* RSA 12-G:14, III. Both parties assume and, accordingly, so will we, that this paragraph applies to this case. RSA 12-G:14, III states:

> for all airport property within . . . the airport district that is owned, leased, or occupied by a person, other than the [PDA], who is subject to the payment of a municipal services fee in lieu of real estate taxes for the provision of services by or on behalf of the [PDA]. . . and to the extent such municipal services fee is based . . . on the valuation of the property by the respective municipality . . . the lessee or [the PDA] . . . may seek a reduction of the valuation by following procedures prescribed in RSA 76 for the abatement of taxes.

Unlike paragraph II, which mandates PILOTs for the non-airport district, paragraph III does not mandate a PILOT for the airport district. *See* RSA 12-G:14, II. Instead, paragraph III provides a remedy for an aggrieved party who believes that a "municipal services fee," which is based upon the valuation of property by the respective municipality, is excessive. *See* RSA 12-G:14, III. When paragraph III is read in context with paragraph IV, which makes the PDA responsible for providing almost all municipal services and allows the PDA to contract with any person to provide such services for the airport district, it is clear that the "fee" is a payment made pursuant to a contract for such municipal services as allowed by paragraph IV(a) or (b). Paragraph III does not require a "municipal services fee" in lieu of taxes, but rather provides a means to challenge such a fee *if* one is being paid and *if* the fee is based upon the valuation of the property. *See id.*

The DRA contends that because such a fee is being paid to Portsmouth, it is a PILOT. This is not persuasive, however, because PILOTs compensate municipalities that are obligated to provide municipal services to tax exempt property. In this case, the PDA, not the municipality, is obligated to provide municipal services to the airport district, with the exception of police services other than security, and the PDA may contract with *any person*, including Portsmouth, to provide municipal services. *See* RSA 12-G:14, IV(c); RSA 12-G:2, XVIII; RSA 12-G:8, VIII.

RSA 12-G:14, III does not convert a contractual payment that may be required of tenants of the PDA in the airport district into a PILOT as contemplated by RSA 21-J:3, XIII. If the "municipal services fee" mentioned in paragraph III were paid to a private entity, it would not be considered a PILOT and included in Portsmouth's total equalized valuation. That the PDA chose to contract with Portsmouth for municipal services, calculating the municipal services fee similar to *ad valorem* taxes, and thereby paying the fee to Portsmouth, does not automatically convert the payment into a PILOT.

Finally, to the extent Portsmouth argues that federal law prohibiting "revenue diversion," *see* 49 U.S.C. § 47107, supports its position that the revenue is not a PILOT, we agree with the Board that this federal statute is unrelated to this analysis. The federal statute prohibits "payments in lieu of taxes *that exceed the value of services provided* . . . [or] for lost tax revenues *exceeding stated tax rates.*" 49 U.S.C. § 47107(1)(2)(c), (d) (emphasis added). We hold here that the revenue is not a PILOT, except for the limited portion that compensates for police services other than security. There is no evidence that the limited portion that is a PILOT exceeds "the value of services provided" or "stated tax rates." *See id.*

■ Therefore, the portion of the PDA airport district revenue that represents payment for "all other police services" under RSA 12-G:14, IV(a) provided by any of the implicated municipalities is a PILOT; the remainder of the revenue paid to Portsmouth by the PDA airport district pursuant to the Agreement for other municipal services is not a PILOT as intended by RSA 21-J:3, XIII.

*Affirmed in part; reversed in part; and remanded.*

BRODERICK, C.J., and NADEAU, DUGGAN and GALWAY, JJ., concurred.