## SCHOOL DISTRICT OF THE CITY OF MONESSEN

v.

## FARNHAM & PFILE COMPANY, INC., County of Westmoreland, Redevelopment Authority of the County of Westmoreland, and Westmoreland County Industrial Development Corporation

### Appeal of: Farnham & Pfile Company, Inc.

Commonwealth Court of Pennsylvania.

Argued May 2, 2005.

Decided June 29, 2005.

Robert L. Byer, Pittsburgh, for appellant.

Ira Weiss, Pittsburgh, for appellee.

BEFORE: McGINLEY, Judge, PELLEGRINI, Judge, and JIULIANTE, Senior Judge.

OPINION BY Judge McGINLEY.

On July 18, 2003, the School District of the City of Monessen (School District) filed a Complaint in Declaratory Judgment seeking a declaration that Farnham & Pfile Company, Inc. (F & P) owed it certain "payments in lieu of taxes" (PILOTs) for Property located in a Keystone Opportunity Zone (KOZ). The parties filed cross motions for summary judgment. On August 4, 2004, the Court of Common Pleas of Westmoreland County (trial court) denied F & P's motion for summary judgment and granted the School District's motion for summary judgment. F & P appeals from the order of the trial court.

### 1. *The KOZ Act*

In October 1998, the General Assembly enacted the Keystone Opportunity Zone Act (KOZ Act).[1] The KOZ Act was passed specifically to address the circumstances of economically and socially distressed communities "characterized by high unemployment, low investment of new capital, inadequate dwelling conditions, blighted conditions, underutilized, obsolete or abandoned industrial, commercial and residential structures and deteriorating tax bases." Section 102 of the KOZ Act, 73 P.S. § 820.102(1). The KOZ Act sought to "restore prosperity" to the areas by offering "temporary relief from certain taxes within the zones." Sections 102(2–3) of the KOZ Act, 73 P.S. § 820.102(2–3). The KOZ Act authorizes the Department of Community and Economic Development (Department) to designate no more than 12 keystone opportunity zones and not more than 12 "subzones" for each keystone opportunity zone. Section 301(b), (c) of the KOZ Act, 73 P.S. § 820.301(b), (c). Persons and businesses within a keystone opportunity zone that are "qualified" are entitled to all tax exemptions, deductions, abatements or credits set forth in the Act for a period not to exceed 15 years. Section 301(b) of the KOZ Act, 72 P.S. § 820.301(b).

In order to qualify for temporary tax relief, a business must "own or lease real property in a subzone ... *from which the business actively conducts a trade, profession or business.*" Section 307(a) of the KOZ Act, 73 P.S. § 820.307(a) (Emphasis added). Each "qualified business" is required to obtain annual certification of its eligibility from the Department; i.e., that it actively conducts a trade, profession or business within the subzone. Section 307(a) of the KOZ Act, 73 P.S. § 820.307(a).

The KOZ Act requires that local taxing bodies, like the School District of Monessen, "exempt or provide[ ] deductions, abatements or credits ... to qualified businesses from local taxes upon designation of the area as a Keystone Opportunity Zone." 73 P.S. § 820.701(a). *See also* Section 301(d) of the KOZ Act, 73 P.S § 820.301(d) ("The political subdivision shall agree to provide exemptions, deductions, abatements or credits from all local taxes set forth in this act in order to qualify to be designated as a subzone"). "Failure to exempt, deduct, abate or credit local taxes shall result in the revocation of the Keystone Opportunity Zone designation." Section 701(a) of the KOZ Act, 73 P.S. § 820.701(a).

The KOZ Act also requires qualified political subdivisions to, by ordinance or resolution, "abate 100% of the real property taxation on the assessed valuation of deteriorated property in an area designated as a subzone." Section 702(a) of the KOZ Act, 73 P.S. § 820.702(a). The "real property tax abatement" applies to all real property located in the subzone, **irrespective of the business activity,** made of the realty by its owner. Section 702(a) of the KOZ Act, 73 P.S. § 820.702(a).

### 2. *The Property*

The Redevelopment Authority of the County of Westmoreland (Authority) owned 54.71 acres in Monessen (Property), known as the Monessen Riverfront Industrial Park. The Property, the former site of the Wheeling Pittsburgh Steel Mill, was deteriorated and in need of renovation and rehabilitation.

### 3. *The 1998 "PILOT" Agreement Between the Authority, IDC and the School District*

In November of 1998, the Authority and its leasing and marketing agent, Industrial

---

1. Act of October 6, 1998, P.L. 705, No. 92, *as amended;* 73 P.S. §§ 820.101–820.1309.

Development Corporation (IDC), informed the School District of their desire to have the Property declared a subzone under the KOZ Act.

On November 12, 1998, the School District, Authority and IDC entered into an agreement (1998 PILOT Agreement) whereby IDC, on behalf of the Authority, agreed to make annual payments in lieu of taxes to the School District. The 1998 PILOT Agreement characterized the annual payments as "contributions or payments" to the County, School District and City "for municipal services and other services to be rendered to the property":

IDC hereby agrees to pay annually, during the period of the designation and approval of the property described on Exhibit "A" as a subzone under the Keystone Opportunity Zone Act, a contribution on behalf of the Authority and IDC for municipal services and other services to be rendered to the property and to the owner and as evidence of its private sector commitment to increasing the employment in the area as follows:

a. Upon the execution of any lease by Authority or IDC after the effective date of the creation and approval of the subzone or the sale of any building or part of any building, if the execution or sale occurs between January 1, 1999, and December 31, 2004, the sum of $0.40 per square foot per year or if the execution or sale occurs between January 1, 2005 through December 31, 2010 the sum of $0.50 per square foot per year will be paid in a pro rata share to the City, County and School District based upon their respective millage to the total millage during the effective term of the Keystone Opportunity Zone.

* * * *

c. The payments set forth ... above shall apply only when the tenant or the purchaser of property situate within the subzone is a qualified business under the Pennsylvania Keystone Opportunity Zone Act. If the tenant or purchaser is not a qualified business under the Pennsylvania Keystone Opportunity Zone Act, Authority and IDC are not obligated to make the payments under a ... above.

1998 PILOT Agreement, November 12, 1998, at 3; R.R. at 13a.

After securing the 1998 Agreement, the School District applied to the Department of Community and Economic Development (Department) to have the Property designated as a KOZ subzone. The School District passed resolutions and exempted the Property from real property taxation, as it was required to do, effective January 1, 1999. Resolution No. KOZ 1, November 10, 1998, at 1–2, R.R. at 16a–17a.

### 4. *Sale of the Property to F & P*

On November 1999, IDC began marketing the property to F & P, a Pennsylvania corporation located in Belle Vernon, PA. As part of its sales pitch, IDC informed F & P that the Property was located in a designated KOZ subzone and, therefore, subject to "a maximum of 12 years of greatly reduced or no tax burden for qualifying residents and businesses." Letter from Kimberly Donnelly, Westmorland County Industrial Development Corporation, to Douglas Farnham, November 15, 1999, at 2; R.R. at 89a.

On March 12, 2001, F & P entered in an Agreement of Sale (Agreement of Sale) with the Authority to purchase the property for $1.45 million. Agreement of Sale, February 23, 2001, at 1–10; R.R. at 26a–35a. F & P's decision to purchase the property was based in part on the tax benefits for both F & P and its tenants. Deposition of Douglas Farnham, February 25, 2004, (Farnham Deposition), at 6; R.R. at 64a. When it agreed to purchase the

Property, F & P agreed to "abide by" the terms of the 1998 PILOT Agreement reached by the School District and the Authority:

> (h) Buyer [F & P] agrees to abide by the terms and conditions of the agreement reached by the Seller [Authority] with the City of Monessen and the City of Monessen School District concerning the payment of certain amounts in lieu of real estate taxes pursuant to that agreement designating the Property and surrounding property as a Keystone Opportunity Zone. The Agreement is attached hereto as Exhibit "D."

Agreement of Sale, March 12, 2001, ¶ 21(h) at 8; R.R. at 33a.

After F & P purchased the Property, the School District demanded that F & P pay the fees for municipal services agreed to by the Authority and the IDC in the 1998 PILOT Agreement. F & P refused and argued that it was under no legal duty or obligation to make the payments.

On July 19, 2003, the City of Monessen and its School District filed a Complaint in Declaratory Judgment and sought a declaration that F & P was obligated to pay $0.40 per square foot per year for tax years 2001, 2002, and 2003, "*as payment in lieu of real estate taxes* to the City, School and County, in their *pro rata shares.*"[2] Complaint in Declaratory Judgment, June 18, 2003, ¶ 20 at 5 (Emphasis added). The School District asserted that F & P agreed to "abide by the terms and conditions" of the 1998 PILOT Agreement which meant that it was required to assume all of the duties or obligations contained in the 1998 PILOT Agreement. The School District also claimed that "[a]s a result of its refusal to pay its obligation, Defendant *[F & P] has paid no real estate taxes since 2001 ... despite the provisions of the [1998 PILOT] Agreement.*" Complaint in Declaratory Judgment, June 18, 2003, at ¶ 22 at 5 (Emphasis added).

Both parties moved for summary judgment. On August 4, 2004, the trial court denied F & P's motion for summary judgment and granted the School District's motion for summary judgment. The trial court held that the Agreement of Sale, clearly and without ambiguity, provided that F & P *agreed* to make payments in lieu of taxes to the School District pursuant to the 1998 PILOT Agreement.

### 5. *F & P's Appeal*

F & P appealed to this Court on August 19, 2004, and raised three issues: (1) whether the trial court erred when it concluded as a matter of law that F & P assumed the Authority's obligation to make payments in lieu of taxes to the School District; (2) whether the trial court erred when it concluded that F & P was a "KOZ qualified business" for purposes of the 1998 PILOT Agreement; and (3) whether the trial court erred when it concluded that the 1998 PILOT Agreement was not contrary to public policy and unenforceable.

After F & P filed its notice of appeal, the trial court issued an opinion pursuant to Pa.R.A.P.1925(b). Contrary to its August 4, 2004, order, the trial court concluded that it had erroneously granted summary judgment in favor of the School District. After performing a second review of the contracts, the trial court agreed with F & P that genuine issues of material fact existed and the Agreement of Sale did not plainly and unambiguously obligate F & P to pay contributions in lieu of real estate taxes:

> F & P argues that the Court erred by making improper findings of fact and

---

2. The City of Monessen voluntarily dismissed its claims on February 23, 2004.

by failing to recognize that genuine issues of material fact existed concerning the interpretation of the contracts and deed that formed the basis for this litigation. After receipt of F & P's Concise Matters Complained of on Appeal, the Court performed a second review [of] these documents and, in light of that review, is now constrained to agree with F & P that they do raise genuine issues of material fact. The agreements and the deed do not plainly and unambiguously obligate F & P to pay contributions in lieu of real estate taxes, and it is not clear from the documents that the parties intended F & P to make such payments. Therefore, the question of whether F & P is obliged to make contributions in lieu of real estate taxes is one that can be resolved by the fact finder.

For the above reasons, the Court concludes that summary judgment should not have been entered in this matter. Unfortunately, F & P's appeal has divested this Court of jurisdiction to correct this error. See *Commonwealth v. Bradley*, 381 Pa.Super. 528, 554 A.2d 127 (1989). Therefore, in the interests of the administration of justice, the case should be remanded to this Court for further proceedings. *See* G. Ronald Darlington, Pennsylvania Appellate Practice 2d § 1701:8.

Trial Court Opinion, September 15, 2004, at 2–3.

▌ In a declaratory judgment action, just as in civil actions generally, summary judgment may be granted only in those cases in which the pleadings, depositions, answers to interrogatories, admissions on file, together with any affidavits, clearly shows that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Harleysville Insurance Companies v. Aetna Casualty and Surety Insurance Company*, 568 Pa. 255, 795 A.2d 383, 385 (2002) (citing *P.J.S. v. Pennsylvania State Ethics Commission*, 555 Pa. 149, 723 A.2d 174 (1999)). In reviewing whether an award of summary judgment is appropriate, appellate courts view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the non-moving party. *Pennsylvania State University v. County of Centre*, 532 Pa. 142, 144–145, 615 A.2d 303, 304 (1992). Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. *Skipworth v. Lead Industries Assoc., Inc.*, 547 Pa. 224, 230, 690 A.2d 169, 171 (1997).

This Court agrees with the trial court that summary judgment was erroneously granted in favor of the School District.

### 6. Whether there is a Genuine Issue of Material Fact regarding whether F & P Agreed to Assume the Authority's Obligations to the School District

Section 21(h) of the Sales Agreement provides that F & P will "abide by" the PILOT Agreement. The parties disagree as to the meaning of this provision.

On the one hand, F & P asserts that Section 21(h) requires only that F & P "abide by" the 1998 PILOT Agreement, and that "abide by" means "to act in accordance with or in conformity to" an agreement (citing Black's Law Dictionary, (8th ed)). F & P contends that, by definition, there is a legal distinction between "abiding by" an agreement and "assuming or taking for oneself" another's debts or obligations. According to F & P, it expressly "assumed" certain obligations and duties of the Authority in other sections of the

Agreement of Sale, but conspicuously avoided doing so in the case of the 1998 PILOT Agreement.

The School District, on the other hand, asserts that there is no substantive difference between the two terms. The School District contends there is no conceivable way that F & P could "act in accordance with or in conformity to" the 1998 PILOT Agreement, without complying with its express terms which required that a fee be paid for municipal services. Brief of Appellee, at 14.

As with any contract, whether a purchaser agrees to assume the obligations of a seller is determined from the language of the agreement.

The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. *Murphy v. Duquesne University of the Holy Ghost,* 565 Pa. 571, 777 A.2d 418 (2001). The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659 (1982). The whole instrument must be taken together in arriving at contractual intent. *Felte v. White,* 451 Pa. 137, 302 A.2d 347 (1973). Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. *Steuart,* 498 Pa. at 51, 444 A.2d at 662. When a writing is clear and unequivocal, its meaning must be determined by its contents alone. *Felte,* 451 Pa. at 143, 302 A.2d at 351.

Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. *Hutchison v. Sunbeam Coal Corp.,* 513 Pa. 192, 519 A.2d 385 (1986). A contract contains an ambiguity "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Id.* This question, however, is not resolved in a vacuum. Instead, "contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Madison Construc. Co. v. Harleysville Mut. Ins. Co.,* 557 Pa. 595, 735 A.2d 100 (1999). In the absence of an ambiguity, the plain meaning of the agreement will be enforced. *Gene & Harvey Builders, Inc. v. Pennsylvania Mfrs.' Ass'n Ins. Co.,* 512 Pa. 420, 517 A.2d 910 (1986). The meaning of an unambiguous written instrument presents a question of law for resolution by the court. *Community College v. Community College, Society of the Faculty,* 473 Pa. 576, 375 A.2d 1267 (1977).

The Agreement of Sale, when read in its entirety, is capable of being understood in more than one sense. On the one hand, the Agreement of Sale provided that F & P was responsible to pay its proportionate share of the individual charges for water and sewer, garbage removal and real estate taxes on a pro rata basis as of the date it formally took ownership of the Property: Paragraph 7 entitled "Proration Items" provided:

> 7. *Proration Items:* Water and sewer charges, municipal garbage and rubbish removal charges, interest and real estate taxes shall be prorated as of date of closing. Real estate taxes shall be prorated for the fiscal year of settlement based upon real estate taxes levied or estimated to be levied in that year by each taxing body (with regard to the date of the levy or the fiscal year of the taxing body).

Agreement of Sale, March 12, 2001, ¶ 7 at 3; R.R. at 28a.

On the other hand, Paragraph 21(h) suggests that the parties intended that F & P take over or assume the Authority's obli-

gation to make annual payments to the City, County, and School District for certain undefined municipal services based on the formula and condition precedents set out in the 1998 PILOT Agreement.

The School District insists that the term "abide by" is simple and straight forward. This may be so, but in its interpretation of the Agreement of Sale, the School District ignores that F & P could not pay the individual water and sewer charges, garbage removal charges and real estate taxes on a pro rata basis pursuant to Paragraph 7, and, **at the same time, assume the obligation of making the annual PILOTS which the Authority ostensibly agreed to pay as a contribution for these same "municipal charges" in Paragraph 21(h).**

Because these provisions are in conflict, and because the phrase "abide by" is ambiguous in the Agreement of Sale, this Court is unable to construe the parties' intent. The ambiguity in the Agreement of Sale creates a genuine issue of fact regarding whether the Authority and F & P intended that F & P would assume the Authority's duties and obligations under the 1998 PILOT Agreement. *See Preston v. Saucon Valley School Dist.,* 666 A.2d 1120, 1127 (Pa.Cmwlth.1995) ("The determination of whether a contract provision is ambiguous is a question of law resolved by the court, while resolution of . . . what was intended by the parties relevant to the ambiguous provision, is for the trier of fact."), *appeal denied,* 545 Pa. 673, 681 A.2d 1344 (1996). Summary judgment in favor of the School District on its Complaint in Declaratory Judgment was inappropriate.

### 7. *Whether F & P is a "Qualified Business" Under the KOZ Act*

Next, F & P argues that assuming *arguendo* it "assumed" the Authority's obli-

gation to make payments in lieu of taxes to the School District, that obligation was subject to an express condition precedent which was never satisfied. According to F & P, the PILOT Agreement unambiguously stated that payments under the Agreement became due only when the Authority leased or sold the Property to a "qualified business" under KOZ Act. The School District does not dispute this. Rather, the dispute lies in whether F & P is a KOZ "qualified business."

F & P contends that it is not a "qualified business" under the KOZ Act because it did not actively conduct its business from the KOZ Property. F & P further asserts that it never claimed or received those exemptions, deductions, abatements and credits which are only available to "qualified businesses" under the KOZ Act. As a KOZ Property Owner, the only benefit F & P claims it is entitled to receive is the 100% abatement of its real property taxes.

As previously noted, the KOZ Act defines a "qualified business" as a business "which is located or partially located within a subzone . . . and is engaged in the active conduct of a trade or business in accordance with the requirements of section 307." Section 103 of the KOZ Act, 73 P.S. § 820.103. In order to meet the criteria of a qualified business under the KOZ Act, the business must "actively conduct a trade, profession or business *from the property located in the subzone*" as prescribed in Section 307 of the KOZ Act, 73 P.S. § 820.307 (Emphasis added). Section 307 of the KOZ Act makes clear that it is the Department that must make an initial determination as to whether a business is qualified under the Act:

(a) Qualifications. *The qualified business shall receive certification from the department that the business is located and is in the active conduct of a trade,*

*profession or business, within the subzone,* improvement subzone or expansion subzone. The business shall obtain annual renewal of the certification from the department to continue to qualify under this section.

73 P.S. § 820.307(a) (Emphasis added).

No business may claim any tax relief under the Act until that business *"receives certification from the department that the business is qualified."* Section 1302 of the KOZ Act, 73 P.S. § 820.1306 (Emphasis added).

Based on the record, this Court is unable to discern whether the Department certified F & P as a "qualified business." The applications and certification letters for 2001, 2002, and 2003, which were made part of the reproduced record at 91a–102a indicate that for 2001 and 2003, F & P applied for "KOZ status" as a **property owner.** The 2002 application indicates that F & P applied for KOZ Status as a **property owner** *and* **as a business.** The form letters from the Department in 2001, 2002, and 2003, merely state that the Department certified F & P to receive "Keystone Opportunity Zone tax benefits" and further stated that F & P was "entitled to the tax relief provisions that apply to [its] specific situation."[3] It is not at all clear if those "tax benefits" were related to F & P's status as a qualified business, a real property owner, or both. Douglas Farnham testified that the 2001, 2002, and 2003 applications and certifications were for real property owners, not for KOZ businesses. Farnham Deposition at 14; R.R. at 72a. However, his testimony is contradicted by

the 2002 application which indicates that F & P applied, at least for that year, as both a business and real property owner.[4]

Because there is a genuine issue of material fact as to whether the Department certified that F & P was a "qualified business" under the KOZ Act, there exists a genuine issue of material fact as to whether the condition precedent in the 1998 PILOT Agreement was satisfied. The trial court erred as a matter of law when it granted summary judgment in favor of the School District.

### 8. *Whether the 1998 PILOT Agreement is Unenforceable as a Matter of Law*

Lastly, F & P contends that there is a dispositive issue that this Court must address which would moot the School District's request for a declaration that F & P **agreed** to make PILOTS to the School District.

■ F & P contends that even if the fact finder concludes on remand that F & P incurred a contractual duty to assume the Authority's obligation under the 1998 PILOT Agreement, that contractual obligation is unenforceable, illegal and invalid. F & P asserts that the 1998 PILOT Agreement imposed the substantive equivalent of real property taxes on the owner of KOZ subzone property; taxes which were expressly prohibited· by the legislature when it enacted the KOZ Act.

This Court finds merit in F & P's argument and agrees that considerations of

---

**3.** Letter from Department to F & P, August 24, 2001, at 1; R.R. at 93a; Letter from Department to F & P, January 31, 2002, at 1; R.R. at 97a; Letter from Department to F & P, April 22, 2003, at 1; R.R. at 102a.

**4.** F & P contends in its Brief at page 18 footnote 3 that "[t]he box for qualified busi-

ness was inadvertently checked on the 2002 application." However, statements in legal briefs and memoranda are not evidence this Court is required to consider. This Court's inquiry is strictly limited to those facts which appear of record.

cost, convenience and judicial economy favor prompt resolution of this issue.

■ Initially, this Court agrees with F & P that real property taxes are waived under the KOZ Act, and formal payments "in lieu of taxes" violate the intent of the Act.

Section 702(a) of the KOZ Act, provides: "Each qualified political subdivision ... *shall* by ordinance or resolution *abate 100% of the real property taxation on the assessed valuation of deteriorated property* in an area designated as a subzone within this Commonwealth." 73 P.S. § 820.702(a) (Emphasis added). The KOZ Act **requires** the exemption of KOZ subzone properties from local property taxes.

According to the undisputed facts, the Authority and IDC agreed (pursuant Paragraph 1(a) of the PILOT Agreement), to pay *"the sum of $0.40 per square foot per year ... in a pro rata share to the City, County and School District based upon their respective millage."* 1998 PILOT Agreement, November 12, 1998, at 3; R.R. at 22a (Emphasis added). The School District claims this "sum" was a "fee" for municipal services, not a property tax. However, the sum was not correlated to any specific services and it did not reflect the fair cost of any particular service provided to the Property by the School District. Nor did the 1998 PILOT Agreement identify any specific service that the School District would provide in exchange for the "fee."

The School District's contention that the static amount of $0.40 per square foot per year is not computed, calculated, billed or discounted as though taxes were involved is also unconvincing. Tax charges are a product of the property's assessed valuation and millage, and millage is based on total assessed value of all properties in the city, county or school district.[5] Contrary to the School District's argument, the so-called annual fee for services was computed precisely as though *ad valorem* property taxes were involved.

Despite the School District's contention to the contrary, there is also no question that the School District sought the enforcement of a PILOT Agreement within the framework of the KOZ Act.[6] Specifically, the School District expressly alleged in its Complaint that it agreed to exempt certain property from taxes in reliance upon the Authority's agreement "to pay the sum of $0.40 per square foot per year ... *constituting a payment in lieu of taxes."* Complaint, ¶ 11–12 at 6a (Emphasis added). The School District alleged that by purchasing the Property F & P assumed the obligation to "pay $0.40 per square foot per foot per year for years 2001, 2002, and 2003 *as a payment in lieu of real estate taxes* " and that because F & P failed to make these payments F & P *"has paid no real estate taxes since 2001."* Complaint, ¶ 20 at 8a (Emphasis added). Further, as a remedy for F & P's failure to make the requested payments, the School District sought either the payments to which the Authority agreed *or the "pay-*

---

**5.** Millage or mill rate is defined as "a tax applied to real property whereby each mill represents $1 of tax assessment per $1,000 of the property's assessed value." Black's Law Dictionary, 8th Ed.

**6.** It is not this Court's intention to address globally the propriety of PILOTs in any other statutory context. For example, other stat-

utes expressly *mandate* PILOTs to the municipality with respect to "tax-exempt" properties in order to compensate for the burdens of providing basic municipal services such as police and fire protection. *See Appeal of the City of Portsmouth*, 151 N.H. 170, 855 A.2d 483 (2004).

*ment of real estate taxes."* Complaint, ¶ 20 at 8a (Emphasis added).

The School District's effort to enforce the PILOT Agreement against F & P in an effort to defray costs of municipal services is directly contrary to the clear intention of the KOZ Act which is to temporarily exempt KOZ properties from such taxation as an incentive for businesses to locate there.

■ Because the PILOTs were calculated and billed like taxes and were not linked to the taxing authority's supply of needed services, this Court concludes that the PILOTS were the equivalent of real property taxes, merely disguised as payments for municipal services. Liability for the payment of taxes in Pennsylvania arises not by reason of a contractual relationship between the taxing body and the taxable, but strictly by operation of law, and the law is well established that taxes can be collected only as provided by statute. *In the Matter of Appointment of Viewers,* 406 Pa. 6, 178 A.2d 149 (1961). Moreover, pursuant to the Pennsylvania Constitution, the power to determine which property shall be subject to taxation and which shall be exempt from taxation is, subject to certain limitations, vested exclusively in the General Assembly. *Southwest Delaware County Municipal Authority v. Aston Township,* 413 Pa. 526, 198 A.2d 867 (1964); *Commonwealth of Pennsylvania State Employees' Retirement System v. Dauphin County,* 335 Pa. 177, 6 A.2d 870 (1939); *Radnor Township School District v. Valley Forge Military Academy Foundation,* 59 Pa. D & C 2d 768 (C.P.Del.1970).[7]

■ In light of the aforesaid legal principles, it follows that the School District was without power or authority to collect real property taxes from F & P, the owner of the KOZ property at issue, *via* enforcement of the 1998 PILOT Agreement. This Court concludes that F & P is not, as a matter of law, liable for such payments, despite the fact that F & P may have initially "agreed" to assume so-called "fees for municipal services" in its Agreement of Sale.[8] As our Supreme Court stated in *Central Dauphin School District v. American Casualty Company,* 493 Pa. 254, 426 A.2d 94 (1981):

7. *See also CITGO Petroleum v. Department of Revenue and Taxation,* 845 So.2d 558 (La.Ct. App.2003), where Citgo Petroleum (Citgo) entered into a PILOT agreement with a municipal taxing authority. As in this case, the municipal taxing authority required assent to the PILOT agreement before it would agree to designate an area eligible for favorable tax treatment under the Foreign Trade Act, 19 U.S. § 81b. The court examined the payments to determine if Citgo was entitled to consider the payments "taxes" for income tax purposes. The court noted that the payments were not based on the value of benefits provided to Citgo, nor correlated to the amount of any particular service to Citgo. The court held that the PILOT payments were in fact taxes.

8. Even if the payments are not "payments in lieu of taxes" but are deemed to be "private contributions" or "payments for specific municipal services", as the School District contends, such payments are hard pressed to be used as a "quid pro quo" for inclusion in the subzone. There is no provision under the KOZ Act which *requires* businesses to *pay* anything in order to qualify for a KOZ subzone designation and KOZ tax benefits or which requires the owner of KOZ property to enter into an agreement with the municipality to pay a sum in lieu of taxes to defray the costs of municipal, non-utility services. *See* 73 P.S. § 820.302. The School District's attempt to make *obligatory* the Authority's voluntary agreement to make private contributions as a way to demonstrate the Authority's "private sector commitment to increasing the employment in the area" amounted to an illegal "quid pro quo" which may not be enforced against F & P.1998 PILOT Agreement, November 10, 1998, ¶ 1 at 3; R.R. at 22a.

In general parties may contract as they wish.... At the same time, however, freedom of contract is not absolute. *A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or if the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.* Id. at 258, 426 A.2d at 96. (Emphasis added).

Accordingly, the order of the trial court is vacated, the entry of summary judgment in favor of the School District is reversed, and the denial of F & P's motion for summary judgment is reversed. A declaratory judgment is entered in favor of F & P.

## ORDER

AND NOW, this 29th day of June, 2005, the order of the trial court in the above captioned matter is vacated, the entry of summary judgment in favor of the School District reversed and the denial of Farnham & Pfile Company, Inc.'s motion for summary judgment is reversed. A declaratory judgment is entered in favor of Farnham & Pfile Company, Inc.